IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA,

v.

JASON VOTROBEK,
JESSE VIOLANTE,
ROLAND CASTELLANOS,
TARA ATKINS, and
DR. JAMES CHAPMAN,

Defendants.

CRIMINAL ACTION FILE
NO. 4:11-CR-022-RLV-WEJ

**ORDER AND
NON-FINAL REPORT AND RECOMMENDATION
ON DEFENDANTS' JOINT MOTION
TO SUPPRESS TITLE III INTERCEPTIONS**

Defendants Jason Votrobek, Jesse Violante, Roland Castellanos, Tara Atkins

and Dr. James Chapman are charged with drug conspiracy and money laundering

offenses in a multi-count Indictment [1] that also seeks forfeiture of cash and property.

Defendants Votrobek, Violante, Castellanos, and Atkins filed a Motion to Suppress

Title III Interceptions [92]. Dr. Chapman filed a Motion to Adopt [94], which was

granted [99].

Through their Joint Motion, defendants seek to suppress evidence obtained from four wiretaps, asserting that the Affidavits supporting the Applications lacked the requisite showing of necessity, and that the wiretap extensions were the tainted fruit of the initial illegal wiretap. They further contend that the affidavits are rife with inaccuracies, deliberate false statements, and material omissions, thus requiring a hearing under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978). Defendants argue that, if the Court removed those offending statements from the Affidavits, then there would be no basis on which to conclude that the initial wiretap or the extensions were supported by probable cause. (Defs.' Jt. Mot. [92] 1, 3, 52-53.) The United States disagrees, asserting that the Affidavits established the necessity for the wiretaps and arguing that defendants failed to make the substantial preliminary showing that the affiant intentionally or recklessly included false information in the Affidavits, as is required to justify a <u>Franks</u> hearing. (<u>See generally</u> Gov't Resp. to Jt. Mot. [109].) In reply, defendants argue that the Government withheld from its medical expert (Dr. Steven Lobel) evidence necessary for him to form a valid opinion as to the legitimacy of Atlanta Medical Group's ("AMG") practices. (Defs.' Jt. Reply [119] 4-6.)[1] Thus,

---

[1] Dr. Chapman failed to join in the reply and, on June 6, 2012, filed a Motion to Adopt [121] that brief as his own. Because Dr. Chapman adopted the original Motion to Suppress Title III Interceptions, the Court will consider the arguments made in the

2

according to defendants, the Affidavits based on that opinion are invalid and cannot provide probable cause for the wiretaps. (Id.) Defendants argue that, at a minimum, the Court should hold an evidentiary hearing on this issue. (Id. at 7.)

For the reasons explained below, the Court finds that the Affidavits sufficiently demonstrated the need for the wiretaps, given the shortcomings of traditional investigative means. Further, the defendants have failed to make the substantial preliminary showing that the affiant intentionally or recklessly included false information in her Affidavits; thus, no <u>Franks</u> hearing is required. Moreover, assuming that these statements were false and they were excluded, probable cause still existed for issuance of these wiretaps. Finally, the good-faith exception applies. <u>See</u> <u>United States v. Leon</u>, 468 U.S. 897 (1984). Therefore, the undersigned **RECOMMENDS** that the Joint Motion to Suppress Title III Interceptions [92] be **DENIED**.

## I.    THE WIRETAP APPLICATIONS AND SUPPORTING AFFIDAVITS

On February 16, 2011, as part of an investigation of defendants by the Drug Enforcement Administration ("DEA"), the United States sought and obtained authority to intercept wire communications conducted over defendant Jason Votrobek's mobile

Joint Reply as to him also; thus, the undersigned **DENIES** the Motion to Adopt as moot.

AO 72A
(Rev.8/82)

telephone (no. 772-643-5516, Target Telephone 1 ("TT-1")). On March 18, 2011, April 19, 2011, and June 6, 2011, the United States sought and obtained an order extending the wiretaps on Mr. Votrobek's telephone. Also on March 18, 2011, the United States sought and obtained authority to intercept wire communications conducted over defendant Jesse Violante's mobile telephone (no. 772-473-0741, Target Telephone 2 ("TT-2")) and Roland Castellanos's mobile telephone (no. 407-431-7631, Target Telephone 3 ("TT-3")). On April 19, 2011, and June 6, 2011, the United States sought and obtained an order extending wiretaps on Mr. Castellanos's telephone. Also on June 6, 2011, the United States sought and obtained authority to intercept wire communications conducted over defendant Tara Atkins's mobile telephone (no. 770-769-7970, Target Telephone 4 ("TT-4")).

DEA Special Agent ("SA") Lourdes M. Bowen provided the Affidavits supporting the Applications for those Title III intercepts. The following sections summarize her Affidavits of (a) February 16, 2011; (b) March 18, 2011; (c) April 19, 2011; and (d) June 6, 2011.[2]

---

[2] In the interest of judicial economy, the Court has relied upon the Government's summary of SA Bowen's lengthy Affidavits, but has reviewed each, compared it to the summary, and made modifications where appropriate.

## A. The February 16, 2011 Affidavit ("TT-1 Aff.")[3]

The DEA began its investigation into AMG as a "pill mill" illegally distributing controlled substances in May 2010. (TT-1 Aff. ¶ 22.) Initially, a traffic stop conducted near AMG revealed four patients in possession of unusually large quantities of controlled substances they had obtained during visits to AMG. (Id.) Agents had also received citizen complaints about suspicious activity at AMG, including high volumes of traffic with out-of-state license plates and large numbers of patients. (Id.) Through investigation, including surveillance, witness interviews,[4] controlled transactions, electronic surveillance, document review and consultation with Dr. Lobel–a medical doctor trained and considered an expert in the area of pain management–the DEA learned that AMG hires doctors to prescribe schedule II narcotics–primarily Oxycodone–to predominantly out-of-state customers without sufficient medical reason, as evidenced by insufficient medical examinations, prescriptions for narcotics in excessive quantities, and on-site filling of the

---

[3] The TT-1 Affidavit is found in the sealed record as WIRE01-000020 to WIRE01-000080.

[4] The DEA interviewed AMG patients Margaret McCarter, Bobby Ray Turner, II, and Lauren Webb. (TT-1 Aff. ¶¶ 24-26.) The DEA also interviewed former AMG employees Jennifer Lawson, Anna Sausville, and Maureen Williams, who provided information about AMG's clinic practices. (Id. ¶¶ 28-31.)

5

prescriptions for cash-only payment, or referral to cooperating pharmacies. (Id. ¶¶ 17, 22.)

Based on consultation with Dr. Lobel, the DEA learned that the exams described by the AMG patients who agents had interviewed were insufficient, as any patient new to a pain clinic should be given a neurological examination that assesses cranial nerves, concentration and speech, a physical examination that assesses strength, reflex, and sensation, and an examination of the affected area–none of which was conducted during the examinations of Ms. McCarter, Mr. Turner, and Ms. Webb. (TT-1 Aff. ¶¶ 24-27.)[5] Further, according to Dr. Lobel, the combination of two doses of Oxycodone,

---

[5] On July 19, 2010, Ms. McCarter told investigators that, during two separate office visits, Dr. Chapman requested that she bend over and touch her toes, lift her leg against resistance, and push her leg against resistance. (Defs.' Jt. Reply Ex. A [119-1]; see also TT-1 Aff. ¶ 24.) SA Bowen included that information in the TT-1 Affidavit and also recounted statements by other patients of similar limited physical examinations. (See TT-1 Aff. ¶¶ 24-27; see also TT-2 Aff. ¶¶ 23-25; TT-3 Aff. ¶¶ 23-25; TT-4 Aff. 23-25.) Likewise, SA Bowen included Mr. Turner's description of a May 2010 examination at AMG, during which Dr. Chapman simply felt his back. (TT-1 Aff. ¶ 25.) According to SA Bowen, Mr. Turner reported to law enforcement that Dr. Chapman "did not complete a thorough exam." (Id.) Similarly, Mr. Turner reported that Dr. Chapman failed to conduct any physical examination during a second visit, but remained seated in a chair while talking to him. (Id.) SA Bowen also summarized Ms. Webb's description of an examination conducted at AMG by Dr. Ellis Efobi, during which he asked Ms. Webb to raise her hands in the air, turn from side to side, lay on her back, and raise her legs. (Id. ¶ 26.)

6

15 mg and 30 mg, in the large quantities that were prescribed, demonstrated a "callous disregard for legitimate prescribing." (Id. ¶ 27.) Dr. Lobel opined that the physicians conducting these exams at AMG violated the Georgia code as it relates to physicians, and also the criminal code in drug dealing under the guise of a physician. (Id.)

In addition, surveillance and currency transaction reports obtained revealed that defendants Violante, Castellanos, and Atkins regularly made bank deposits at SunTrust Bank at the close of business, and that Violante in particular personally deposited tens of thousands of dollars into the AMG account. (TT-1 Aff. ¶ 23.) In July 2010, deposits into the AMG account ceased, and individuals associated with AMG began depositing large amounts of currency into Crownroland Corp., d/b/a AMG, Votrobek Investments LLC, and Violante Investment & Leasing LLC. (Id.) Approximately one month later, in August 2010, the AMG account was nearly liquidated through large cash withdrawals, but in December 2010 deposits into the AMG account again commenced. (Id.) SA Bowen concluded that this activity demonstrated an attempt to thwart law enforcement efforts and conceal AMG's assets. (Id.)

The DEA also conducted surveillance at AMG, and on more than one occasion observed Dr. Chapman travel to a nearby liquor store, buy Vodka, and return to AMG during operating hours. (TT-1 Aff. ¶ 32.) The DEA conducted trash pulls of the

7

dumpsters located in front of AMG, and located empty liquor bottles consistent with those agents had observed Dr. Chapman purchase, as well as blank medical forms used by AMG, which out-of-state patients signed to assert that they would not obtain adequate medical care in their home states. (Id. ¶ 33.) Based on the investigation to date, SA Bowen concluded that the totality of AMG's business practices were typical of a Drug Trafficking Organization ("DTO"), and that AMG was operating as a pill mill. (Id. ¶¶ 34-35.)

SA Bowen's Affidavit revealed that Cooperating Source Two ("CS-2") had identified TT-1 as belonging to defendant Votrobek. (TT-1 Aff. ¶ 36.) Moreover, after execution of search warrants at Florida pill mill clinics co-owned by Votrobek, DEA agents called TT-1, asked to speak to Votrobek, and he identified himself over that phone, thus corroborating the information provided by CS-2. (Id.)

SA Bowen detailed a November 15, 2010, consensually recorded telephone call between Mr. Votrobek (using TT-1) and CS-2, wherein Votrobek acknowledged his involvement with Zach Rose in pill mill clinics in Jacksonville, Florida. (TT-1 Aff. ¶ 37.) During the call, Votrobek described what he had learned not to do at a clinic to raise suspicion from law enforcement. (Id.) Indeed, he employed that knowledge at AMG by, for example, building a privacy fence to enclose the back of AMG to be used

8

as a waiting area so customers would not loiter in the open and bring attention to AMG, and by utilizing surveillance and counter-surveillance techniques. (Id.) SA Bowen further detailed contacts between TT-1 and telephone numbers used by Castellanos, Timothy Sturlock, and Jamie Priest, all of whom were believed to be co-conspirators. (Id. ¶¶ 38-40.)

SA Bowen identified the goals of the investigation to include discovering:

(a)     the nature, extent, methods, and incidents of diverting controlled narcotics outside of their legitimate medical purpose and money laundering of the TARGET SUBJECTS and others;

(b)     the identities, locations, and roles of accomplices, aiders and abettors, co-conspirators, and other participants in their illegal activities;

(c)     the knowledge and intent of the TARGET SUBJECTS, accomplices, aiders and abettors, co-conspirators, and other participants to purposely divert controlled narcotics outside of their legitimate medical purpose for financial gain;

(d)     the distribution and transfer of funds and contraband involved in these illegal activities;

(e)     the existence and location of records related to the TARGET SUBJECTS' illegal activities;

(f)     the location and source of resources used to finance their illegal activities;

9

(g)     the location and disposition of the proceeds from those activities; and

(h)     the identification of locations and items (including other telephones) that these individuals are using to further their unlawful activities.

(TT-1 Aff. ¶ 41.) SA Bowen further averred that during interception of TT-1, the DEA hoped to (a) learn the inner workings of this DTO, including the knowledge and intent of the Target Subjects purposely to divert controlled narcotics for financial gain; (b) identify additional locations and assets used by the Target Subjects; and (c) identify additional co-conspirators.  (Id. ¶ 42.)

SA Bowen explained the shortcomings of other methods of investigation, and the reasons it was critical to continue the investigation by conducting Title III wire intercepts, as follows:  (1) although the doctors could be brought before the medical board in connection with the described illicit activity, AMG's funders would simply open new pain clinics and hire new doctors (TT-1 Aff. ¶ 43); (2) although the DEA had been able to identify the financiers, several of the doctors, several of the co-conspirators, and several locations associated with the DTO, agents had not been able to demonstrate the knowledge and intent of the targets to divert controlled substances for financial gain, given that the DTO had become savvy in ways to impede

10

law enforcement and make AMG appear legitimate due, in part, to law enforcement actions that had taken place at a purported Florida pill mill co-owned by defendant Votrobek (id. ¶ 44); (3) information sharing with the Florida investigation involving Votrobek would not succeed because the Florida investigation did not focus on Votrobek's illegal activity in Georgia (id. ¶¶ 47-48); (4) pen registers had been used, and would continue to be used, but could only provide the time, frequency, and duration of calls, not the content of conversations (id. ¶¶ 50-51); (5) although three Confidential Sources ("CS") had been used, further cooperating sources were unlikely to succeed because Violante had become guarded with CS-1, Votrobek had not returned any of CS-2's telephone calls, CS-3 would be unable to have the type of communication with the targets needed to show their knowledge and intent, and the targets had become very guarded since the Florida law enforcement action (id. ¶¶ 52-56); (6) wire intercepts were needed to corroborate information provided by the cooperating sources as those individuals could have credibility issues due to their criminal histories (id. ¶ 57); (7) although DEA anticipated utilizing an undercover agent to go into AMG as a "patient," the use of undercover agents was otherwise not a viable option to have interaction or contact with the clinic's funders, who were the primary targets of the investigation (id. ¶¶ 58-59); (8) interviews of patients and

employees had not been successful because they had limited information about the clinic's funders and their illicit activities (id. ¶ 60); (9) interviews of targets and other co-conspirators was unlikely to succeed because such interviews would likely contain a significant number of untruths and false leads, and further, such interviews would alert members of the DTO and compromise the investigation, possibly resulting in individuals fleeing and moving or destroying evidence (id. ¶ 61); (10) grand jury subpoenas were unlikely to succeed because the individuals who would be subpoenaed would likely invoke their Fifth Amendment privilege not to testify, and it would have been unwise at that stage to grant immunity because that grant might foreclose prosecution of the more culpable members of the DTO and would not ensure truthful testimony (id. ¶ 62); (11) subpoenas to telephone record custodians or financial institutions would not assist with the identification of other co-conspirators, or the ultimate goal of showing the knowledge and intent of the targets and co-conspirators purposely to divert controlled narcotics for financial gain (id. ¶¶ 63-64); (12) physical surveillance was unlikely to succeed because of the general limitations of physical surveillance and because the DTO was cognizant of law enforcement and performed counter-surveillance (id. ¶¶ 65-68, 71); (13) video surveillance had been used, but was insufficient to achieve the goals of the investigation because it only could identify

12

individuals arriving and departing from AMG (id. ¶ 69); (14) GPS trackers had been used, but corroborating the daily driving of the targets was insufficient to identify the full scope of their knowledge and intent in purposely and willfully diverting controlled narcotics for financial gain (id. ¶ 70); (15) executing search warrants at known locations would not achieve the goals of the investigation to identify the targets' knowledge and intent in purposely and willfully diverting controlled narcotics for financial gain (id. ¶¶ 73-74); and (16) trash pulls were unlikely to succeed because the targets were unlikely to dispose of important records in the garbage. (Id. ¶ 75.)[6]

**B.    March 18, 2011 Affidavit ("TT-2 Aff.")[7]**

SA Bowen's March 18, 2011 Affidavit (TT-2 Aff.) supported the application to intercept TT-2 (used by Violante) and TT-3 (used by Castellanos), and also sought an extension of the interception of TT-1 (used by Votrobek). The TT-2 Affidavit repeats many of the details found in the TT-1 Affidavit, but includes some new information. For example, SA Bowen avers in the TT-2 Affidavit about an interview of a Source of

---

[6] Based on SA Bowen's Application and supporting Affidavit (i.e., the TT-1 Aff.), the Honorable William S. Duffey, Jr., United States District Judge, signed the Order Authorizing the Interception of Wire Communications on February 16, 2011. (See WIRE01-000081 to WIRE01-000091.)

[7] The TT-2 Affidavit is found in the sealed record as WIRE02-000019 to WIRE02-000104.

AO 72A
(Rev.8/82)

Information ("SOI"), who was a current employee of AMG and able to observe activities occurring there. (TT-2 Aff. ¶ 31.) The SOI reported that Dr. Chapman still prescribed controlled narcotics to patients even if they tested positive for marijuana on their urine tests. (Id.) The SOI further stated that patients would meet with a doctor for only three to five minutes, and that Dr. Chapman did not perform examinations, but routinely prescribed both 160 to 180 Oxycodone 30 mg pills and 70 to 90 Oxycodone 15 mg pills to patients. (Id.) According to the SOI, Dr. Daniachew prescribed roughly the same types and amounts, but would prescribe Dilaudid in place of the Oxycodone 15 mg pills. (Id.) The SOI further stated that patients paid $350 for a new patient visit, $300 for a follow-up visit, and an additional $700 to $1,000 for the prescriptions that were filled at AMG. (Id.) The SOI added that AMG saw approximately 75-80 patients per day, Monday through Thursday, and approximately 40-50 patients on Fridays, that AMG accepted only cash and/or debit card payments, and that AMG owned money counters. (Id.) Also, according to the SOI, AMG's patients were dirty, fidgety, and fell asleep in the waiting room, and that approximately one to two times per week, defendant Atkins returned from lunch drunk and defendant Castellanos routinely consumed alcohol in his office. (Id.)

14

In support of the extended wiretap on TT-1 (used by Votrobek), SA Bowen detailed a March 4, 2011, intercepted call between Votrobek and Castellanos wherein they discussed a competing pain clinic that was impacting their business, and their plan to send Timothy Spurlock into that clinic in an undercover capacity. (TT-2 Aff. ¶ 36.) SA Bowen further relayed the contents of a March 10, 2011, call between Votrobek and Atkins, wherein Atkins advised Votrobek that a neighboring business informed her the Georgia Bureau of Investigation ("GBI") had been watching AMG, and that she was concerned that the GBI might seize the large amount of cash (approximately $100,000) that AMG had on hand. (Id. ¶ 37). Votrobek advised Atkins to have Castellanos take care of it by transporting the cash to Castellanos's residence. (Id.). On that date, March 10, 2011, electronic surveillance revealed Atkins exiting AMG with what appeared to be a handheld safe, placing it in her vehicle's trunk, and departing AMG. (Id.)

In support of the wiretap on TT-2 (used by Violante), SA Bowen provided details about a meeting between Violante and CS-1 that occurred in approximately December 2010, wherein CS-1 asked Violante for "30s," and Violante replied that CS-1 would have to go through the clinic but could "get what you need." (TT-2 Aff.

15

¶ 39.) According to CS-1, Violante has known him for approximately fifteen years and knew that there was nothing physically wrong with him. (Id.)

In a December 9, 2010, consensually recorded call between Violante and CS-1, Violante admitted certain techniques that AMG used to thwart law enforcement and avoid raising suspicion, including not seeing customers from Florida–likely due to the law enforcement activity in Florida. (TT-2 Aff. ¶ 40.) An intercepted call on February 18, 2011, between Votrobek and Violante, as detailed by SA Bowen, revealed that Votrobek had agreed to meet with a third party to find out about the clinics that had shut down, and to gather information that would help him and the other targets to thwart law enforcement efforts against the targets and AMG. (Id. ¶ 41.) Because Votrobek and Violante would have no need to continue to associate themselves with individuals associated with shady businesses, i.e., other pill mill clinics, if they were running a legitimate pain clinic, SA Bowen concluded that this call corroborated the fact that Votrobek and Violante were running a pill mill. (Id.)

In support of the wiretap on TT-3 (used by Castellanos), SA Bowen provided details of a March 1, 2011, intercepted conference call between Votrobek, Violante, and Castellanos, wherein they discussed additional methods to avoid law enforcement suspicion, including accepting credit card payments and health insurance, and

16

changing the ownership of AMG–on paper–to Dr. Chapman, and listing Votrobek, Violante, and Castellanos as shareholders.  (TT-2 Aff. ¶ 45.)  SA Bowen further described a March 16, 2011, intercepted call between Votrobek and Castellanos, wherein they discussed needing to have a talk with Dr. Chapman because of his assertion that he could only see forty to forty-five patients per day, which would cause AMG to go out of business.  (<u>Id.</u> ¶ 46.)  Based on this call, SA Bowen concluded that Votrobek, Violante, and Castellanos were not silent financial partners, and were less concerned with running a legitimate medical practice than with selling pills for profit. (<u>Id.</u>)

SA Bowen again listed the shortcomings with other methods of investigation, and the reasons it was critical to continue the investigation through Title III wire intercepts.  (TT-2 Aff. ¶¶ 49-85.)  Most of these shortcomings were the same as those listed in the TT-1 Affidavit; however, with regard to the use of an undercover agent, SA Bowen explained that one had be sent into AMG as a "patient," but was advised that he needed an MRI and a doctor's referral.  (<u>Id.</u> ¶ 67.)  As of the time of submission of the TT-2 Affidavit, the undercover agent had obtained a MRI, but had not yet obtained a referral letter.  (<u>Id.</u>)  Nonetheless, as detailed in the TT-1 Affidavit, law enforcement believed that use of an undercover agent was not a viable option for

17

achieving the ultimate goal of the investigation because the agent would not have interaction or contact with the clinic's funders, who were the primary targets of the investigation. (Id.) Additionally, as evidenced by an intercepted call between Votrobek, Castellanos, and Violante, the targets knew that undercover agents were being sent into pill mill clinics. (Id.)[8]

C. **April 19, 2011 Affidavit ("TT-3 Aff.")**[9]

The TT-3 Affidavit, which sought an extension of the interceptions of TT-1 and TT-3, repeats much of the information contained in the TT-1 Affidavit. Additional information provided in the TT-3 Affidavit came from intercepted calls. For example, in support of the continued wiretap on TT-1, SA Bowen detailed a March 22, 2011 call between Votrobek and Violante, wherein Violante described as "awesome" the fact that AMG had sold all of the pills that it had on hand, and they discussed opening a stand-alone pharmacy to serve AMG patients in order to sell more pills. (TT-3 Aff. ¶ 36.) SA Bowen noted that there was no reference in their discussion to the medical

---

[8] Based on SA Bowen's Application and supporting Affidavit (i.e., the TT-2 Aff.), the Honorable Timothy C. Batten, Sr., United States District Judge, signed the Order Authorizing the Interception of Wire Communications on March 18, 2011. (See WIRE02-000105 to WIRE02-000116.)

[9] The TT-3 Affidavit is found in the sealed record as WIRE03-000019 to WIRE03-000095.

necessity of selling more pills, and there was a lack of consultation with the clinic's doctors. (Id.) SA Bowen concluded, in part based on Dr. Lobel's findings, that the mere fact that AMG was selling pills and profiting from their sale was strongly suggestive of criminal intent due to the existence of an inherent conflict of interest between a profit motive and legitimate medical care. (Id.)

SA Bowen also detailed a March 22, 2011, intercepted call between Votrobek and Violante, in which they discussed that Violante and Atkins would be looking at buildings to be used to establish pharmacies, thereby permitting AMG to distribute more pills. (TT-3 Aff. ¶ 37.) In this call, Votrobek and Violante demonstrated a heightened awareness of law enforcement, particularly in Calhoun, Georgia, where law enforcement was working to shut down pill mills located there, indicating to SA Bowen their knowledge of AMG's illicit activity. (Id.)

SA Bowen also described an April 12, 2011, intercepted call between Votrobek and Teresa Faulkner, an identified Jacksonville, Florida pill mill associate of Votrobek, wherein Votrobek expressed his concern about obtaining pills because another doctor had left the practice, and he discussed his plan to open "a couple of pharmacies" in order to deal with the problem of obtaining pills in mass quantities. (TT-3 Aff.¶ 38.) Votrobek and Faulkner then discussed distributors who might supply AMG in the

19

interim. (Id.) Consistent with Dr. Lobel's findings, SA Bowen concluded that existing distributors were unwilling to supply AMG with the quantity of pills it was seeking because AMG was distributing them far in excess of what was consistent with accepted medical practice. (Id.) SA Bowen again noted that the calls do not reference medical need for the additional pills. (Id.)

In support of the extended wiretap on TT-3, SA Bowen detailed a March 30, 2011, intercepted call between Castellanos, Atkins, and Kim Bovino, wherein they discussed the fact that Dr. Chapman was not going to see more than thirty-five patients per day, and that they needed another doctor because they were losing money. (See TT-3 Aff. ¶ 39.) SA Bowen concluded that AMG did not want Dr. Chapman to see more than thirty-five patients per day to avoid raising suspicion as to AMG being a pill mill, and that this call demonstrated knowledge by the targets that AMG was engaged in illicit activity and showed the extent to which the owners and operators of AMG were directly involved in the medical practice of the doctors. (Id.)

SA Bowen also described a March 31, 2011, intercepted conference call between Castellanos, Bovino, Atkins, John Cendor, and several employees of AMG, wherein Cendor provided advice on how to thwart regulatory and law enforcement efforts against AMG. (TT-3 Aff. ¶ 40.) One way to do so was by distributing medications

20

other than pain pills in an amount equal to the pain pills in order to shield AMG from audit and to make it appear less suspicious. (Id.)

SA Bowen also detailed an April 11, 2011, intercepted call between Castellanos and Atkins, wherein Atkins asked Castellanos if she could "write on the medical charts in the doctor area" as long as Dr. Chapman signed off on them, and Castellanos affirmed. (TT-3 Aff. ¶ 41.) Atkins advised Castellanos that she would be helping Dr. Chapman see patients because he was too incapacitated–falling asleep, not making sense, and going over the wrong chart with the wrong person–to practice legitimately. (Id.) SA Bowen concluded that this call demonstrated that AMG was not engaged in the legitimate practice of medicine, and that its owners and operators were directly complicit in AMG's criminal activity. (Id.) Of particular note to SA Bowen was the fact that there was no discussion of terminating Dr. Chapman's employment, which SA Bowen concluded was due to the fact that he could procure controlled narcotics and AMG's owners and operators were not concerned about the legitimate practice of medicine. (Id.) Finally, SA Bowen again explained the shortcomings of other methods of investigation, and the reasons it was critical to continue the investigation

AO 72A
(Rev.8/82)

through Title III wire intercepts, which were largely the same as those contained in the TT-2 Affidavit.  (Id. ¶¶ 42-79.)[10]

**D.     June 6, 2011 Affidavit ("TT-4 Aff.")**[11]

As before, the TT-4 Affidavit, which sought an extension of the interceptions of TT-1 and TT-3, and the initial interception of TT-4 (used by Atkins), repeated much of the information contained in the TT-1 Affidavit.  Additional information supplied in the TT-4 Affidavit came from intercepted calls.  In support of the continued wiretap on TT-1, SA Bowen detailed an April 20, 2011, intercepted call between Votrobek and Violante, wherein Votrobek complained about law enforcement conducting surveillance and making contact with residents of a house located on the street where he lived.  (TT-4 Aff. ¶ 37.)  SA Bowen concluded that this call demonstrated Votrobek's continuing awareness of law enforcement and his concern that he was being investigated, which was consistent with his having knowledge that AMG was involved in illegal activity.  (Id.)

---

[10] Based on SA Bowen's Application and supporting Affidavit (i.e., the TT-3 Aff.), the Honorable Thomas W. Thrash, Jr., United States District Judge, signed the Order Authorizing the Interception of Wire Communications on April 19, 2011.  (See WIRE03-000096 to WIRE03-000107.)

[11] The TT-4 Affidavit is found in the sealed record as WIRE04-000021 to WIRE04-000109.

AO 72A
(Rev.8/82)

SA Bowen also included information about a May 13, 2011, intercepted call between Votrobek and Violante, wherein they discussed construction of the new pharmacy and their unhappiness with the estimate they had received for construction costs. (TT-4 Aff. ¶ 38.) SA Bowen concluded that this call demonstrated: (1) that AMG was dispensing so many pills that it required its own pharmacy–consistent with the activity of a pill mill; (2) that AMG's owners/operators reflected no concern that AMG's dispensing habits might be excessive or illegal, but saw those barriers as obstacles to be circumvented; (3) the targets' knowledge, evidenced by their involvement in the day-to-day activities of AMG, including its dispensing habits, as the new pharmacy was both a means of obtaining controlled narcotics more easily and an attempt to avoid suspicion that AMG was a pill mill since it would no longer self-dispense the controlled narcotics and would have the new pharmacy cater to AMG patients; and (4) money laundering, as AMG would pay for construction of the pharmacy with proceeds from the illegal sale of drugs. (Id.)

SA Bowen also detailed a May 16, 2011, intercepted call between Votrobek and Violante, wherein they discussed another "very obvious" pain clinic, Vero Wellness. (TT-4 Aff. ¶ 39.) According to SA Bowen, this call demonstrated that the targets continually discussed other pain clinics in order to assess the competition, identified

23

doctors who might be willing to work for AMG, and made sure that AMG's operation was not as blatant as other pill mill clinics. (Id.)

In support of the continued wiretap on TT-3, SA Bowen detailed an April 27, 2011, intercepted call between Castellanos and Atkins, wherein Atkins stated that Top Rx would no longer be selling controlled narcotics to AMG because of problems identified with the dispensing log and the "ratio." (TT-4 Aff. ¶ 40.) Atkins stated that AMG had to continue selling pills, even if she had to prescribe them and get Dr. Chapman to sign off on them, and Castellanos agreed. (Id.) SA Bowen concluded that, considering Atkins is not a doctor, the call demonstrated AMG was dispensing pills solely for profit and without any legitimate medical purpose. (Id.) This fact was further demonstrated in the call when Atkins and Castellanos, who also was not a doctor, discussed coming up with a package of non-controlled items that AMG could prescribe to patients, and how to direct Dr. Chapman to complete dispensing logs so that they appeared legitimate. (Id.) They also discussed distributing non-controlled items to patients even if they did not want them and AMG had to put them back in stock, just to show that AMG was dispensing non-controlled items. (Id.)

SA Bowen also described a May 13, 2011, intercepted call between Castellanos and "Manny," believed to be Dr. Amanuel Daniachew, wherein they discussed Dr.

24

Daniachew's potential re-employment by AMG. (TT-4 Aff. ¶ 41.) They further discussed subpoenas received from the Georgia Medical Board, and Castellanos stated that "every chart" sent in response to the subpoenas was "re-evaluated before being sent." (Id.) SA Bowen concluded that this call demonstrated that AMG reviewed and possibly altered patient charts before responding to subpoenas. (Id.) SA Bowen stated that this conclusion was supported by previous patient and employee interviews, which established that Dr. Chapman neither conducted legitimate patient examinations nor engaged in legitimate prescribing regimens, thereby giving AMG an incentive to "doctor" patient files in order to avoid sanction by the Georgia Medical Board. (Id.) SA Bowen further concluded that this call demonstrated knowledge that AMG might have been in trouble, that AMG's principals knew that AMG was engaged in wrongdoing, and that they were seeking to cover their actions by eliminating activities believed to draw attention, as evidenced by the decision that AMG would no longer self-dispense. (Id.)

SA Bowen also detailed a May 18, 2011, intercepted call between Castellanos and Chris Bailey (an innocent third party employed by SunTrust Bank), wherein they discussed setting up an account for JJR Pharmacy at that bank. (TT-4 Aff. ¶ 42.) Castellanos stated that he did not want the account to be connected to the AMG

25

account, and that he was the sole proprietor of the business. (Id.) SA Bowen concluded from this call, in which Castellanos sought to dissociate the pharmacy account from AMG even though it would provide the funding, that Castellanos and the other targets were attempting to conceal what was really happening, and attempting to conceal Votrobek's and Violante's identities, which evidenced their knowledge of AMG's money laundering activities. (Id.)

In support of the wiretap on TT-4, SA Bowen described an April 27, 2011, intercepted call between Atkins and Castellanos, wherein they discussed giving patients Biofreeze, an over-the-counter analgesic used to prevent or relieve pain through cold therapy, so that the patients could go longer between taking their medication; thus, patients who were selling pills that they had purchased with prescriptions obtained from AMG could sell more because they would consume fewer pills themselves. (TT-4 Aff. ¶ 43.) SA Bowen concluded that this call demonstrated the targets' knowledge that patients were illegally diverting controlled narcotics, and that they were actively taking steps to facilitate that illegal activity. (Id.)

SA Bowen also included a May 13, 2011, intercepted call between Atkins and Castellanos wherein Atkins admitted to drinking on the job, and also advised Castellanos that AMG had to order $6,000 worth of non-controlled drugs in order to

26

obtain controlled drugs from a pharmaceutical company. (TT-4 Aff. ¶ 44.) SA Bowen concluded that this call demonstrated that non-doctors were involved in the clinic's prescribing practices, with one purpose in mind–to prescribe as many pills as possible–and that AMG was not a legitimate business, as evidenced by both Atkins' and Chapman's on-the-job consumption of alcohol. (Id.)

As before, SA Bowen set out the shortcomings of other methods of investigation, and the reasons it was critical to continue the investigation by conducting Title III wire intercepts. (TT-4 Aff. ¶¶ 48-93.) The majority of the shortcomings was the same as was set forth in the TT-3 Affidavit; however, SA Bowen added that the DEA was in the process of preparing search warrants for execution in June 2011 at locations associated with AMG and the targets. (Id. ¶ 55.) SA Bowen further detailed additional physical surveillance of the targets that had been conducted; however, SA Bowen explained that because of the general limitations of physical surveillance (which cannot detect what occurs inside locations), and because the alleged DTO was cognizant of law enforcement and performed counter-surveillance,

27

physical surveillance could not succeed in achieving the goals of the investigation and

did not alleviate the need for the wiretaps.  (Id. ¶¶ 82-89.)[12]

## II.   DISCUSSION

### A.   Standards Governing Wiretaps

"Title III of The Omnibus Crime Control and Safe Streets Act of 1968, 18

U.S.C. §§ 2510-2520, sets forth numerous requirements the government must meet

before electronic surveillance (wiretaps) may be authorized."  United States v. Flores,

No. 1:05-CR-558-WSD-JFK, 2007 WL 2904109, at *21 (N.D. Ga. Sept. 27, 2007).

For example, pursuant to 18 U.S.C. § 2518, a wiretap application must include:

> a full and complete statement of the facts and circumstances relied upon
> by the applicant . . . including details as to the particular offense . . ., a
> particular description of . . . the type of communications sought to be
> intercepted, the identity of the person . . . whose communications are to
> be intercepted, and a full and complete statement as to whether or not
> other investigative procedures have been tried and failed or why they
> reasonably appear to be unlikely to succeed if tried or to be too
> dangerous.

United States v. Gonzalez Perez, 283 F. App'x 716, 720 (11th Cir. 2008) (per curiam)

(quoting 18 U.S.C. § 2518(1)(b), (c)) (internal marks omitted) (alterations in original).

---

[12] Based on SA Bowen's Application and supporting Affidavit (i.e., the TT-4 Aff.), the Honorable Amy Totenberg, United States District Judge, signed the Order Authorizing the Interception of Wire Communications on June 6, 2011.  (See WIRE04-000110 to WIRE04-000121.)

AO 72A
(Rev.8/82)

Upon a proper application, a district judge may issue an ex parte order authorizing the interception of wire communications if

> the judge finds probable cause to believe that an individual is committing or has committed a qualifying offense; that particular communications concerning that offense will be obtained through such interception; and that the facilities from which, or the place where, the communications are to be intercepted are being used in connection with the offense, or are leased to, listed in the name of, or commonly used by such person.

United States v. Duarte-Rosales, No. 1:05-CR-197-6-TWT, 2008 WL 140665, at *2 (N.D. Ga. Jan. 11, 2008) (citing 18 U.S.C. § 2518(3)(a), (b), (d)); see also United States v. Robles, 283 F. App'x 726, 734-35 (11th Cir. 2008) (per curiam).

As reflected in the above-cited authorities, the affidavit supporting the application must establish both probable cause and the necessity for the wiretap. "Probable cause for a wiretap is the same probable cause required for a search warrant," Duarte-Rosales, 2008 WL 140665, at *2, and "[l]ike other types of warrants, probable cause must exist at the time surveillance is authorized," Flores, 2007 WL 2904109, at *21 (citing United States v. Domme, 753 F.2d 950, 953 (11th Cir. 1985)). "[P]robable cause exists if the totality of the circumstances indicate that there is a fair probability that the sought for evidence will be obtained." United States v. Peterson, 627 F. Supp. 2d 1359, 1363 (M.D. Ga. 2008) (citing Illinois v. Gates, 462 U.S. 213,

29

239 (1983)). "The probable cause determination of the judge who issued the wiretap order will be upheld if the judge had a 'substantial basis' for concluding that probable cause existed." Id. (quoting United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990)).[13]

"Pursuant to 18 U.S.C. § 2518, court-ordered electronic surveillance is prohibited unless the government demonstrates the necessity of such techniques." United States v. Wilson, 314 F. App'x 239, 243 (11th Cir. 2009) (per curiam) (citation omitted). "This statute requires that wiretap applications include a 'full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" United States v. Collins, 300 F. App'x 663, 666 (11th Cir. 2008) (quoting 18 U.S.C. § 2518(1)(c)); see also Wilson, 314 F. App'x at 243. "The purpose of this statute is to ensure that wiretapping is not resorted to in situations in which

---

[13] Defendants do not assert that SA Bowen's Affidavits as submitted to the district judges fail to establish probable cause; instead, as noted above, they contend that if the asserted material falsehoods, deliberate misrepresentations, conclusions without foundation, and speculative assertions are deleted from the Affidavits following a Franks hearing, then there would be no basis to conclude that the initial interceptions or any of the extensions were supported by probable cause. (Defs.' Jt. Mot. 52-53.)

AO 72A
(Rev.8/82)

traditional investigative techniques[14] would suffice to expose the crime." <u>Collins</u>, 300 F. App'x at 666. "The affidavit need not show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.'" <u>Id.</u> (quoting <u>United States v. Van Horn</u>, 789 F.2d 1492, 1496 (11th Cir. 1987)); <u>see also</u> <u>United States v. Pecheco</u>, 489 F.2d 554, 565 (5th Cir. 1974) ("[T]he purpose of the [necessity] requirement in section 2518(1)(c) is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.").[15]

"The district court is entitled to broad discretion in analyzing the necessity issue, and the government's showing on necessity must be read in a practical and commonsense fashion." <u>United States v. Newsome</u>, No. CR 108-062, 2008 WL 4820257, at *3 (S.D. Ga. Nov. 4, 2008) (internal marks and citation omitted).

---

[14] "Traditional investigative techniques include: physical surveillance, cooperating witnesses, informants, controlled drug purchases, pen registers and trap and trace devices." <u>Collins</u>, 300 F. App'x at 667 n.2.

[15] The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981. <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981) (en banc).

"Congress' purpose in conditioning wiretaps upon a showing of necessity was narrow." United States v. Hammond, No. 2:10-cr-0007-JMS-CMM, 2011 WL 201497, at *5 (S.D. Ind. Jan. 18, 2011). "Congress wanted to ensure not that wiretaps are used only as a last resort in an investigation, but that they were not to be routinely employed as the initial step in criminal investigation." Id. (internal marks and citation omitted). Therefore, "the necessity hurdle is not great." Id. (internal marks and citations omitted).

In reviewing challenges to Title III intercepts, the Court is mindful that "'wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.'" United States v. Stokes, No. 96 CR 481 (SAS), 1996 WL 727400, at *5 (S.D.N.Y. Dec. 18, 1996) (quoting United States v. Steinberg, 525 F.2d 1126, 1130 (2d Cir. 1975)). Moreover, "a wiretap order is presumed to be valid, and a defendant has the burden of overcoming the presumption and of proving that the wiretap order was unlawfully obtained." Flores, 2007 WL 2904109, at *22.

32

**B.   The Affidavits Established the Necessity for the Wiretaps**

Defendants argue that the Government failed to establish the necessity for the wiretaps at issue and that the fruits of the wiretap orders should therefore be suppressed. Specifically, defendants argue that SA Bowen identified obstacles present in street DTOs and argued that those same obstacles were present in this case, although AMG was a seemingly legitimate business. (Defs.' Jt. Mot. 8.) They assert that law enforcement failed to pursue interviews with persons associated with AMG; failed to timely subpoena or review patient files; and failed to subpoena prescription records for patients. (Id.)

Contrary to defendants' assertions, SA Bowen's Affidavits reveal that law enforcement did interview former AMG employees and AMG patients. Moreover, agents employed several other traditional investigative techniques for almost a year before seeking the wiretaps at issue. SA Bowen provided a detailed explanation of the investigative techniques already employed[16] and the reasons why those techniques had failed to achieve the investigation's objectives or why she believed that those

---

[16] As noted above, techniques that the Government had tried included (1) pen registers; (2) confidential informants and sources; (3) interviews with AMG patients; (4) interviews with former AMG employees; (5) physical surveillance; (6) electronic (video) surveillance; (7) GPS trackers; and (8) trash searches.

AO 72A
(Rev.8/82)

techniques or others would fail in this particular investigation.  See Van Horn, 789

F.2d at 1496 ("The affidavit need not . . . show a comprehensive exhaustion of all

possible techniques, but must simply explain the retroactive or prospective failure of

several investigative techniques that reasonably suggest themselves.").

Defendants are correct that the Government did not subpoena patient files or

prescription records before seeking these wiretaps.  However, it seems that such

subpoenas would not have been helpful in law enforcement's attainment of its stated

investigatory objectives.[17]  See Van Horn, 789 F.2d at 1497 (the Government's

ultimate objective and the traditional methods' usefulness to that objective are

important to necessity inquiry).  Additionally, as discussed supra Part II.A, the law

does not require that all possible methods of investigation be exhausted before agents

may seek a wiretap.  "[T]he fact that the traditional methods in use were producing

evidence does not alter [the Court's] conclusion."  United States v. Allen, 274 F.

App'x 811, 816 (11th Cir. 2008) (per curiam).

Because the Affidavits show that the traditional methods law enforcement had

employed were "unhelpful to the government's goal of revealing the entire

_____

[17] Those objectives were articulated by SA Bowen at paragraph 41 of the TT-1
Affidavit, items (a)-(h), and are quoted supra Part I.A.  (See also TT-2 Aff. ¶ 49; TT-3
Aff. ¶ 42; TT-4 Aff. ¶ 48.)

34

conspiracy," <u>Allen</u>, 274 F. App'x at 816, SA Bowen's Affidavits met the necessity requirement for electronic surveillance under Title III.  <u>See</u> <u>Van Horn</u>, 789 F.2d at 1497; <u>see also</u> <u>United States v. Kelley</u>, Crim. No. 08-00327-GG, 2009 WL 2589086, at *3 (S.D. Ala. Aug. 17, 2009) (where conventional techniques will not show the entire scope of the conspiracy, a wiretap is permissible, even in those situations where conventional techniques will allow for the arrest and conviction of some members); <u>United States v. Olmedo</u>, 552 F. Supp. 2d 1347, 1366 (S.D. Fla. 2008) ("the statute simply requires that the affiant explain to the issuing judge the difficulties surrounding the traditional investigative techniques that already had been taken, or been contemplated to have been taken.  This was done, and [the district judge] did not err in assessing those difficulties and signing the orders to intercept.").

### C.     **Defendants Have Not Established the Need for a Franks Hearing**

Affidavits supporting applications for wiretaps are presumptively valid.  <u>Franks</u>, 438 U.S. at 171; <u>see also</u> <u>United States v. Novaton</u>, 271 F.3d 968, 986 (11th Cir. 2001) (applying <u>Franks</u>, which addressed a search warrant affidavit, to an affidavit supporting a wiretap application).

> In order to be entitled to an evidentiary hearing on a motion to suppress based on alleged misrepresentations or omissions in a [wiretap] affidavit, a defendant must make a substantial preliminary showing that the affiant

35

made false statements, either intentionally or with reckless disregard for the truth, pointing specifically to the portions of the affidavit claimed to be false, and that the false statements were necessary to the finding of probable cause. When assessing whether the alleged false statements and omissions were material, the trial court is to disregard those portions of the affidavit which the defendant has shown are arguably false or misleading. "[E]ven intentional or reckless omissions will invalidate a [wiretap] only if inclusion of the omitted facts would have prevented a finding of probable cause." Looking only at the remaining portions of the affidavit, the court will then determine whether including the omitted facts would have prevented a finding of probable cause. The defendant bears the burden of showing that, "absent those misrepresentations or omissions, probable cause would have been lacking." "'[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the [wiretap] affidavit to support a finding of probable cause, no hearing is required.'"

United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009) (citations omitted).

Franks thus established a two-prong standard for obtaining a hearing. United States v. Cross, 926 F.2d 1030, 1040 (11th Cir. 1991). An insufficient showing on one prong of the Franks inquiry–(1) the affiant deliberately or recklessly included false statements, or failed to include material information; and (2) the misrepresentation was essential to the finding of probable cause–precludes the need to address the other prong. United States v. Weber, 808 F.2d 1422, 1424 (11th Cir. 1987) (court need not reach the second step of deciding if the affidavit is sufficient without the statements in question where the preliminary showing that an affiant made deliberately false or

reckless statements or omissions is insufficient); <u>see also</u> <u>Franks</u>, 438 U.S. at 171 ("if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content to support a finding of probable cause, no hearing is required").

A defendant does not establish a <u>Franks</u> violation by showing that the affidavit submitted in support of the warrant application contains an error, or even several negligent errors. Innocent mistakes, or even negligent misrepresentations, are insufficient to establish a <u>Franks</u> violation. <u>Franks</u>, 438 U.S. at 171 ("Allegations of negligence or innocent mistake are insufficient" to mandate an evidentiary hearing); <u>United States v. Wuagneux</u>, 683 F.2d 1343, 1355 (11th Cir. 1982) (at most the affiant negligently failed to analyze all available data before drawing his conclusions or was simply mistaken as to the significance of various transactions; thus, no intentional or reckless falsity established because, even if proven, allegations of negligence or innocent mistake are insufficient to require a <u>Franks</u> hearing).

Finally, a defendant's attack on an affidavit "'must be more than conclusory and must be supported by more than a mere desire to cross-examine.'" <u>Flores</u>, 2007 WL 2904109, at *32 (quoting <u>Franks</u>, 438 U.S. at 171). "'There must be allegations of

deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.'" Id. (quoting Franks, 438 U.S. at 171).

### 1. There Is No Evidence That the Affiant Intentionally or Recklessly Made False Statements or Omissions

Defendants generally challenge almost every conclusion that SA Bowen drew in her Affidavits, accusing her of distorting, spinning, and mis-characterizing innocent conversations or events. However, as the Government correctly contends, an "affiant's conclusion is merely an opinion and cannot legitimately be characterized as false or misleading." United States v. Powell, No. 10-20169, 2010 WL 3476080, *9 (E.D. Mich. Sept. 2, 2010). Moreover, because SA Bowen provided the District Judges with the detailed facts upon she relied in reaching those conclusions—which they obviously considered—there is no basis to assert that she deliberately provided false statements or showed a reckless disregard for the truth. Although defendants assert that one could draw alternative innocent conclusions from those facts, a defendant's submission of his own counter-interpretation of facts upon which a conclusion is based does not satisfy the showing required for a Franks hearing. United States v. Jimenez, 824 F. Supp. 351, 361 (S.D.N.Y. 1993).

AO 72A
(Rev.8/82)

Thus, the Court turns to the specific challenges that defendants make in their

Joint Motion. Defendants assert that three statements in SA Bowen's Affidavits were

deliberately false or recklessly made:[18]

(1) SA Bowen's statement that there was evidence that "AMG possibly altered patient charts before copying and sending the files in response to the subpoenas" from the Georgia Medical Board (Defs.' Jt. Mot. 48; TT-4 Aff. ¶ 41);

(2) SA Bowen "intentionally and falsely states that 'Bovino has intimate knowledge of AMG being a pill mill'" (Defs.' Jt. Mot. 50; TT-4 Aff. ¶ 47); and

(3) SA Bowen "intentionally or with a reckless disregard for the truth misrepresented that the records subpoenaed by The Georgia Medical Board were unavailable to law enforcement" (Defs.' Jt. Mot. 51; TT-4 Aff. ¶ 81).

Defendants also claim that SA Bowen deliberately omitted the following facts

from her Affidavits:

---

[18] To the extent that defendants include alleged false or reckless statements of witnesses referenced in the Affidavits as sources of information, those statements are not relevant to the determination of the first prong of the Franks inquiry, which focuses only upon the veracity of the affiant. See Franks, 483 U.S. at 171 ("The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant."). Thus, defendants' complaints about those portions of SA Bowen's Affidavits wherein she reported that AMG employed a "bouncer" and that its maintenance man took patients' vital signs (Defs.' Jt. Mot. 15, 19; TT-1 Aff. ¶¶ 24, 31) are immaterial.

39

(1)     Both Castellanos and Atkins reached out to state and Federal law enforcement agencies for guidance (Defs.' Jt. Mot. 17; TT-1 Aff. ¶ 29); and

(2)     Exculpatory comments in the November 15, 2010 consensually recorded call, and the April 27, 2011 intercepted call (Defs.' Jt. Mot. 22, 27, 49; TT-1 Aff. ¶¶ 37, 54; TT-4 Aff. ¶ 43).

Additionally, in their Joint Reply, defendants allege that SA Bowers deliberately misrepresented AMG's clientele and treatment of patients to Dr. Lobel, and then used that ill-gotten opinion to bolster the Affidavits. (Defs.' Jt. Reply 3-6.) Dr. Lobel opined, as set forth in the Affidavits, that the physicians employed by AMG were not practicing medicine, but rather were dealing drugs. (TT-1 Aff. ¶ 27; TT-2 Aff. ¶ 26; TT-3 Aff. ¶ 26; TT-4 Aff. ¶ 4 ¶ 26.) Defendants allege that SA Bowers intentionally or recklessly misinformed Dr. Lobel in the following ways:

(1)     By discussing with him only three patients out of thousands in lieu of providing him with a representative sample of actual patient files (Defs.' Jt. Reply 4-6); and

(2)     By deliberately misrepresenting the thoroughness with which Dr. Chapman examined Ms. McCarter before prescribing her pain medication (id. at 6 (citing Ex. A (Report of Investigation summarizing Ms. McCarter's July 19, 2010 statement))).

Defendants make no offer of proof–only their conclusory allegations–to establish that the above-referenced statements and omissions were deliberately false

40

or made with a reckless disregard for the truth. Defendants' Joint Motion is not accompanied by a statement of supporting reasons, affidavits or sworn or otherwise reliable statements of witnesses, or a satisfactory explanation for their absence. See Franks, 438 U.S. at 171. Therefore, defendants' allegations are insufficient to make the required preliminary showing. See United States v. Mathison, 157 F.3d 541, 548 (8th Cir. 1998) ("The requirement of a substantial preliminary showing 'is not lightly met.' A mere allegation standing alone, without an offer of proof in the form of a sworn affidavit or witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing") (internal citations omitted).

Nevertheless, the Court reviews the alleged deliberately false statements and omissions. As for the first statement, i.e., that there was evidence that AMG possibly altered patient charts before copying and producing them in response to subpoenas from the Georgia Medical Board, defendants' contention is contradicted by the Affidavit itself. The foundation for SA Bowen's statement was a call intercepted on May 31, 2011 between Castellanos and Manny LNU, who was believed to be Amanual Daniachew. (TT-4 Aff. ¶ 41). During that call, in which those individuals discussed Daniachew's potential re-employment by AMG as a second doctor, Castellanos stated that "every chart" that was sent in response to the subpoenas was "re-evaluated before

41

being sent." (Id.) SA Bowen stated in her Affidavit that this intercepted call, and particularly Castellano's statement that the charts were "re-evaluated before being sent," indicated that AMG had reviewed and possibly altered the patient charts before copying and producing them in response to subpoenas from the Georgia Medical Board. (Id.) SA Bowen further averred that this conclusion was additionally supported by previous patient and employee interviews which established that Dr. Chapman did not conduct legitimate patient examinations and engaged in illegitimate pill prescribing patterns, thereby giving AMG an incentive to "doctor" the patient files in order to avoid sanction by that Board. (Id.) Although defendants do not agree with SA Bowen's interpretation of the call, that disagreement does not establish that the statement was "an intentional fabrication without foundation" (Defs.' Jt. Mot. 48), or that it was otherwise false or made with a reckless disregard for the truth. SA Bowen detailed the contents of the call upon which she was basing her conclusion, and she qualified her statement acknowledging that the call and other evidence indicated AMG "possibly" altered the charts. (TT-4 Aff. ¶ 41). Her interpretation of the call, made in light of her training and experience, as well as her knowledge of the investigation, was reasonable, even if there were other innocent interpretations. United States v. Reeh, 780 F.2d 1541, 1544-45 (11th Cir. 1986) (circumstances which would not be

42

suspicious to a casual observer may justify an officer's reasonable suspicion of illegal activity when considered in light of his experience).

The alleged falsehood of the second statement–that "Bovino has intimate knowledge of AMG being a pill mill"–is also contradicted by SA Bowen's Affidavit. (See TT-4 Aff. ¶¶ 45-47.) Intercepted calls occurring between April 26, 2011 and May 25, 2011, in which Castellanos, Bovino, Crook and Cendor arguably indicated Bovino's awareness that AMG was illegally distributing controlled substances, were the foundation for the statement that SA Bowen included in her Affidavit. (Id.). Specifically, SA Bowen referenced Bovino's question to Castellanos about falsifying AMG's dispensing logs in order to obtain controlled substances. (Id. ¶ 47.) As noted above, although defendants disagree with SA Bowen's interpretation of the intercepted calls, that does not establish that her statement was false or made with reckless disregard for the truth.

With regard to the third referenced statement–that SA Bowen "intentionally or with a reckless disregard for the truth misrepresented that the records subpoenaed by the Georgia Medical Board were unavailable to law enforcement"–defendants have not offered any proof or support for their contention that this statement was deliberately false or made with a reckless disregard for the truth. (TT-4 Aff. ¶ 81.) As previously

43

discussed, if SA Bowen were mistaken in this assertion, innocent mistakes, or even negligent misrepresentations, are insufficient to establish a Franks violation. Franks, 438 U.S. at 171; Wuagneux, 683 F.2d at 1355. Likewise, "Franks does not require that all statements in an affidavit be true; it simply requires that the statements be 'believed or appropriately accepted by the affiant as true.'" United States v. Campino, 890 F.2d 588, 592 (2d Cir. 1989) (quoting Franks, 438 U.S. at 165)). Defendants have thus failed to offer any proof or support for their contention that SA Bowen's alleged omissions were made intentionally or with a reckless disregard for the accuracy of her Affidavits.

As to the claimed omission of the allegedly exculpatory nature of the November 15, 2010, consensually recorded call, and the April 27, 2011, intercepted call, assuming the truth of defendants' assertion, these omissions also fail to establish a Franks violation. See United States v. Mims, 812 F.2d 1068, 1074 (8th Cir. 1987) (defendant's allegation that affiant "misrepresented the true nature of the recorded conversations does not rise to the level of 'deliberate falsehood' or 'reckless disregard for the truth' as required by Franks"); accord, Jimenez, 824 F. Supp. at 361. As to the claim that SA Bowen omitted the fact that both Castellanos and Atkins reached out to state and Federal law enforcement agencies for guidance (Defs.' Jt. Mot. 17),

44

defendants fail to offer any proof that this purported omission was made intentionally or with a reckless disregard for the accuracy of the Affidavit.[19]

With regard to defendants' allegation that SA Bowen deliberately withheld the medical records of AMG patients from Dr. Lobel, defendants have offered no proof that SA Bowen possessed the medical files of any AMG patients at the time she solicited Dr. Lobel's opinion. Moreover, defendants do not support their contention that such files are the best evidence for an expert to consider when proffering an opinion as to the legitimacy of a medical practice. Here, Dr. Lobel clearly considered the following patterns and practices of AMG (as set forth in the Affidavit) observed by and reported to law enforcement: officers received complaints from the public of a high volume of vehicles with out-of-state license plates at AMG; officers found AMG patients with prescriptions for large amounts of narcotics during traffic stops; Dr. Chapman's Georgia Medical License stated that his specialty is general surgery;

_____

[19] Inclusion of the omitted allegedly exculpatory portions of those telephone calls would not have altered the probable cause determination. The incriminating portions of those conversations, in conjunction with the other evidence contained in SA Bowen's Affidavits, were more than sufficient to allow the District Judges to conclude that there was probable cause to believe that an individual was engaged in criminal activity, that particular communications concerning the offenses would be obtained through interception, and that the target facilities were being used in connection with specified criminal activity. See United States v. Donovan, 429 U.S. 413, 435 (1977) (citing 18 U.S.C. § 2518(3)(a)-(d)).

AO 72A
(Rev.8/82)

and three patients told law enforcement that AMG doctors prescribed multiple doses of Oxycodone in large quantities after only a minimal physical examination. (See TT-1 Aff. ¶¶ 22-26.) Dr. Lobel then opined, based on his experience, as to the likely significance of that information as follows: out of state patients likely indicate abuse/addiction/diversion; such travel is rare to obtains the care of a specialist, let alone a general surgeon; patients new to a pain clinic should undergo a neurological examination that assess cranial nerves, concentration, and speech and a physical examination that assesses strength, reflex, sensation, and the affected area; and the prescription of two doses of Oxycodone in large quantities is illogical and unreasonable because such medication is scored down the middle and can easily be halved by a patient (i.e., a patient can easily half a 30 mg pill to administer only 15 mg, making a separate prescription for the lower dose unwarranted). (See id. ¶ 27.) Thus, although defendants disagree as to the best evidence upon which to base an opinion as to the legitimacy of AMG's practices, they have not established that SA Bowers intentionally or recklessly withheld evidence from the Government's expert, or that Dr. Lobel's opinion was arguably false or misleading.

As to the claim that SA Bowers failed to inform the Government's expert that Dr. Chapman thoroughly examined Ms. McCarter prior to prescribing her pain

medication, that contention is contradicted by the Affidavit itself. In a July 19, 2010, interview, Ms. McCarter told investigators that, during two separate office visits, Dr. Chapman requested that she bend over and touch her toes, lift her leg against resistance, and push her leg against resistance. (See Defs.' Jt. Reply Ex. A.) SA Bowen included that information in the TT-1 Affidavit (along with statements by other patients of similar limited physical examinations). (See TT-1 Aff. ¶¶ 24-27.) Moreover, it appears that she did provide that information to Dr. Lobel, as he related to her the specific neurological and physical assessments which he believed a doctor should make before prescribing narcotics, i.e., examination of cranial nerves, concentration, speech, strength, reflex, and sensation. (See id. ¶ 27.) Thus, defendants have failed to show that Dr. Lobel's conclusion that AMG doctors were "not engaged in the practice of medicine as much as drug dealing" (id.) was unfounded, or the result of SA Bowers withholding information from him.

Because the defendants have failed to make a substantial preliminary showing that SA Bowen deliberately or recklessly included false or unfounded information in the Affidavits, or intentionally or with a reckless disregard for the accuracy of the Affidavits omitted material information, as required to establish a Franks violation, defendants are not entitled to an evidentiary hearing.

47

### 2. Even Excluding the Alleged False or Reckless Statements and Including the Omissions, Probable Cause Still Remains

Although none of the challenged statements in SA Bowen's Affidavits have been shown to be false or recklessly made, this Court's exclusion of them would not affect the probable cause finding by the four above-listed district judges. In other words, even if the challenged statements were omitted, there remains sufficient content in the Affidavits to support a finding of probable cause. The Affidavits contain a full account of the investigation to date, including detailed descriptions of AMG's activities received as a result of interviews of AMG patients, former AMG employees and one current AMG employee, surveillance, and details from numerous intercepted telephone calls among the alleged conspiracy's members establishing their knowledge of, and full participation in, AMG's alleged criminal activity. See Donovan, 429 U.S. at 435.

### D. Leon's Good-Faith Exception

Even if the wiretaps were found to be invalid, suppression of the evidence seized is not warranted because the agents reasonably relied in good faith on the warrants. See Leon, 468 U.S. at 897. "[T]he purpose of the exclusionary rule is to act as a deterrent to willful conduct that violates individual rights." United States v. Russell,

48

Cr. No. 2:08CR121-WHA, 2008 WL 4649051, at *5 (M.D. Ala. Oct. 20, 2008) (internal marks and citation omitted). In the present case, "the law enforcement officers did exactly what the law requires," in that applications and affidavits for the wiretaps at issue were submitted to federal district judges, all of whom then made a probable cause determination. Id. Given these circumstances, it was objectively reasonable for the agents to conclude that probable cause for the warrants existed and for them to rely in good faith on the wiretap orders issued by four district judges–Duffey, Batten, Thrash, and Totenberg. See id.; United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998); Flores, 2007 WL 2904109, at *7; United States v. Leiva-Portillo, No. 1:06-CR-350-WSD, 2007 WL 1706351, at *12 (N.D. Ga. June 12, 2007).

## III.  CONCLUSION

For the reasons stated above, the undersigned **DENIES AS MOOT** Dr. Chapman's Motion to Adopt [121], and **RECOMMENDS** that Defendants' Joint Motion to Suppress Title III Interceptions [92] be **DENIED**.

AO 72A
(Rev.8/82)

**SO ORDERED AND RECOMMENDED,** this 12th day of June, 2012.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)